LUTE L. ROGERS vs. WILLIAM B. KENDALL et al.

Waldo.    Opinion February 20, 1923.

*The burden of showing that chemicals purchased for potato fertilizer purposes contained a sufficient amount of borax poison to diminish the potato crop is upon the plaintiff alleging such affirmative proposition and in the case at bar is not sustained. It is exceptional error to exclude evidence tending to prove that the use of chemicals for fertilizer purposes such as are the same as those in issue in the case at bar, combined in the same proportions, and using the same amount of potatoes, on farms in the same vicinity resulted in producing crops ranging from two hundred bushels per acre to three hundred bushels per acre.*

The plaintiff avers he had a small crop of potatoes from seed planted upon the fertilizer involved in the instant case and that the presence of borax poisoning was the sole cause. Whether borax poison was present in the chemicals, in sufficient quantity to diminish his potato crop was the only issue. The burden was on the plaintiff to establish his contention. We think he has failed to do so.

A proper interpretation was given to the meaning and application of R. S., Chap. 36, Sec. 12, which provides that "for the purposes of this chapter, an article shall be deemed to be adulterated . . . ." "In case of commercial fertilizer . . . . if it contains any material deleterious to growing plants." Under that clause of the statute is presented the only issue in this case. The court held that "deleterious meant deleterious matter in such a quantity as to be deleterious to growing plants," and instructed the jury that the statute was malum prohibitum and applied regardless of scienter on the part of the defendants. The instruction was correct.

The exception is based upon the exclusion of the following offer of evidence, namely: "Defendant offers evidence of various other farmers tending to prove that such farmers, using chemicals on farms located in the town of Troy and vicinity, purchased from the defendants in 1919, and coming out of the same mess, and combined by them in the same proportions, and using the same amount of potatoes, applying 1200 pounds per acre to one ton per acre,—these figures being given as the equivalent of mixed goods, that is, a weight of $87\frac{1}{2}$ pounds being equal to 100,—produced crops ranging from 200 bushels per acre to 300 bushels per acre." It will undoubtedly be conceded that the above evidence, if admissible, is very important. We think that the evidence was admissible.

On exceptions and a general motion for a new trial by defendants. This is an action on the case in which the plaintiff seeks to recover

from the defendants, damages for breach of implied warranty in the sale of chemicals for fertilizer purposes. The plaintiff alleged that the chemicals purchased by him of defendants contained a sufficient amount of borax poison to be deleterious to the potato plants thus resulting in a small potato crop. The case was tried to a jury and a verdict for plaintiff for $3,737.31 was rendered. The defendants excepted to the exclusion of certain testimony and also filed a general motion for a new trial. Motion sustained. Exceptions sustained.

The case is very fully stated in the opinion.

*Dunton & Morse and Carroll N. Perkins*, for plaintiff.

*McLean, Fogg & Southard and A. S. Littlefield*, for defendants.

SITTING: SPEAR, PHILBROOK, DUNN, WILSON, DEASY, JJ.

SPEAR, J. This case comes up on motion and exceptions. In some respects it is a case of novel impression. The plaintiff purchased of the defendant a quantity of chemicals represented by a certain proportion of nitrate of soda, phosphate, potash, sulphate of ammonia and tankage, to be mixed by him into a fertilizer designated when completed by the formula 4-8-6, meaning a composition of four per cent. available ammonia, eight per cent. available phosphate, and six per cent. soluble potash. The plaintiff's sole complaint is, that the chemicals which he bought were not suitable for the mixture as a fertilizer for potatoes, "but contained borax in sufficient quantities to prevent the germination of seed potatoes and killed the young plants and sprouts."

The plaintiff avers he had a small crop of potatoes from seed planted upon this fertilizer and that the presence of borax poisoning was the sole cause. Whether borax poison was present in the chemicals, in sufficient quantity to diminish his potato crop was the only issue. The burden was on the plaintiff to establish his contention. Historically, it appears from the testimony of the plaintiff's expert that in 1919, the time when the chemicals were purchased by the plaintiff the fact that borax, or boron, was deleterious to the germination of potato seed or injurious to the plants was entirely unsuspected, if indeed it was not regarded as beneficial, as shown by the following question put to Professor Woods, the plaintiff's expert, and his answer. Q. "As a matter of fact, those experiments were conducted for the purpose of finding whether the difficulty

with the crop was due to borax?" A. "Not primarily. The experiment was really started to find if there might be a beneficial effect from the addition of borax." This statement related to a bulletin published in 1920. In further confirmation of the foregoing statement of the effect of borax on potatoes, Professor Woods, in reply to the question "Wasn't it a fact that the learning at that time was that twenty pounds of borax per acre didn't do any harm," testified, "But I am frank to say that if I had been asked in the Spring of 1919 if twenty pounds of borax, or any other material, distributed over an acre of land would be likely to produce serious deleterious effects, I should have said it probably wouldn't have."

The case, therefore, starts out with the conceded fact that the defendants had no knowledge that borax to the extent of six and six tenths pounds, the maximum quantity found in the present mixture, would injure potato seed or the plants. This was immaterial, however, as to their liability. It further appears, that up to the season of 1919, no one, expert or grower, had any definite knowledge which enabled them to detect the symptoms of borax poisoning. All of Professor Woods's experiments were made after July, 1919. It is hence evident from the foregoing facts that the witnesses who testified to the symptoms of borax poisoning had meagre opportunity to gain definite and reliable information upon that subject. But upon proof, by affirmative evidence, not conjecture or unwarranted inference, that six and six tenths pounds of borax to the acre practically destroyed the plaintiff's crop of potatoes, depends the decision of his case. A mere statement in the face of inherent contradiction is not sufficient to sustain a verdict, as we have many times declared. It was incumbent upon the plaintiff to prove that the presence of six and six tenths pounds of borax to the acre impaired his crop of potatoes. The only evidence in the case which tends to prove that less than six and six tenths pounds of borax to the acre will prove deleterious to a potato crop is the ipse dixit of Professor Woods, who testified upon this point, as an expert, as follows: Q. "What is the effect of borax on growing potatoes?" A. "In quantities of more than three pounds per acre it has been found to be deleterious and increasingly deleterious as the amount is increased, so that ordinarily, under ordinary conditions, as high as twenty pounds would practically stop a crop."

There is no evidence in the case by which that opinion is supported. But, on the contrary, it is contradicted by Professor Woods's own experiment as confirmed by him in bulletins issued under his approval, and by other testimony as to the symptoms of borax poisoning. It seems that the question of the effect of the presence of borax in fertilizers had come to a point of more or less agitation in the latter part of 1919. Therefore, Professor Woods, as the head of the Maine Experiment Station connected with the University of Maine, at Orono, began an official investigation of the borax question in 1919 and 1920, at Presque Isle, a typical potato soil, in the county of Aroostook. As before stated by Professor Woods, this investigation was begun upon the theory that borax was beneficial rather than deleterious. Woods admitted that these experiments were made in conjunction with his department, the results of which were manifested by the following questions put to, and answers made by, him:

Q. "Didn't the experiment upon soil at Presque Isle show that the crop of potatoes was larger when about six pounds of borax was found to be in the fertilizer or they were planted with fertilizer that contained six pounds of borax,—larger than without borax?" A. "Within an experimental error of a field experiment." Q. "Those experiments showed also that when there was about twelve pounds of borax per acre in the fertilizer, the yield was greater than it was when the fertilizer was free from borax?" A. "Within experimental error; yes, sir." Q. "And when there was nearly eighteen pounds of borax there was less yield per acre than there was in the corresponding test rows planted without any borax?" A. "But still within experimental error." Q. "And when there was a little over $23\frac{1}{2}$ pounds of borax per acre present there was a somewhat less production than where no borax was present?" A. "The same answer to that; within experimental error." He undertook to parry the effect of that investigation made under his own direction, by saying, that the fertilizer was mixed with more soil than in the ordinary process of planting, intending that an inference might be drawn that the seed would not thereby come in the usual contact with the fertilizer. But in his experiment, according to his own testimony, the fertilizer was so mixed with soil that twelve pounds of borax at least would be beneficial, while he must have known that the farmer so mixed his fertilizer with his potato planter that six pounds would practically destroy his crop. The whole force of his

testimony upon this point was to convey the idea to the jury that the difference in the method of distributing the fertilizer in the row made the difference in the beneficial and deleterious effect of the borax upon the crop. And it was well calculated to convey confuse and mislead the jury who could not possibly analyze the evidence as it went along. Notwithstanding his testimony in court he nevertheless permitted to be published in his bulletin to the farmers, for the purpose of giving information "that would be helpful to the farmer," the following statement with reference to the distribution in his Presque Isle experiment, namely: "It would seem, therefore, that the method of distributing the fertilizer in the experiment being slightly different from the practice of the farmers, aided no doubt by the weather conditions at the time of planting, contributed toward less harm from borax than was experienced by many of the farmers in that locality." That bulletin was either true or false. It was not contradicted by any evidence at the trial. It was the last word based on any experiment. It was true, of course, and intended for information upon which the farmers could act with safety. And it says plainly that, with a method of distribution "slightly different" the experiment of Professor Woods and Mr. Brown showed that twelve pounds of borax to the acre was not deleterious. If the phrase "slightly different," in the sense in which it was used in the bulletin, meant the difference between the use of twelve pounds of borax without harm and the use of three pounds with harm and the use of six and six tenths with disaster, then the bulletin was a fraud and deception for failing to fully explain the full import of the phrase. It was not the bulletin, however, but the testimony in an attempt to avoid the force of the bulletin that was wrong. It would, moreover, seem unreasonable upon the face of the statement to say that the "slight difference," indicated by the language of this bulletin, in the distribution of the fertilizer in the experiment, would mark the difference between rendering twelve pounds of borax beneficial and six and six tenths well nigh destructive to the crop. The bulletin effectually contradicted the attempted explanation that the difference was due to the method of distribution. Notwithstanding the statement that three pounds would injure a crop, it, nevertheless, remains that the only evidence based upon experiment was that six, or even seven pounds of borax per acre did not injure the seed, plants, or the crops.

It furthermore appears from another question and answer of Professor Woods that he had made no experiment which modified his testimony as to the results of the trial test at Presque Isle, as shown by the following question and answer: Q. "I was asking you whether there were any other experiments aside from the plant pot experiments and the one you say the result of which has not been given out, that were the foundation of your information?" A. "Experiments conducted by me. So far as I know, my knowledge is based on field observations in 1919, on Mr. Brown's experiments as published in the bulletin which you have shown, on Mr. Brown's unpublished work, on the work in our own greenhouse at the Maine Agricultural Experiment Station, and on work under my direction done cooperatively by the eight northeastern experiment stations, at the University of Vermont greenhouse." With regard to the foregoing answer it should be noted that Brown's experiment was the Presque Isle test; that the greenhouse experiments were of no value; and that no result of the eight northeastern experiments was reported, and yet, the Professor says that his knowledge (from which he testified) is based upon the above tests, not one of which shows that three pounds of borax is deleterious, but, on the contrary, so far as they disclosed any evidence in regard to the matter, show that six and six tenths pounds are not harmful, but beneficial. It is highly significant that no evidence from any experiment or test up to the date of the trial was offered to prove that six pounds, or six and six tenths pounds, of borax, to the acre would do any harm to the seed, or the growing plants, or had done any. If such evidence had resulted from any experiment, up to that time made, it is very evident that it would have been produced. There is then no evidence except the ipse dixit of Professor Woods, and the opinions of other lesser experts, unsupported by any experiment or other test, that tends to show that six and six tenths pounds of borax per acre is deleterious to a potato crop. When the evidence upon this point is analyzed, every test, as to the quantity of borax that will do injury, is eliminated except the Presque Isle experiment which shows that six and six tenths pounds per acre is beneficial rather than otherwise.

The contention that the injury to the plaintiff's potato crop was due to the presence of borax is further contradicted by the testimony of Alfred N. Soule, Chief Deputy in the Department of Agriculture, called by the plaintiff. It was testified by all the witnesses on both

sides that the seed planted upon the plaintiff's field was either all gone or so decayed as to leave only the skin.    Mr. Soule, it seems, in the season of 1919, made a very careful and exhaustive study of the effect of borax, covering one hundred and seventeen fields.    In regard to its effect upon the pulp of the seed, he says:    Q.    "And if you had gotten a history that the seed pieces rotted within a few weeks after they were put into the ground would you attribute that to borax poisoning?"    A.    "Not in all cases."    Q.    "Would you in any case?"    A.    "I don't think that I could ever say that I have seen where the rotting of the seed pieces was caused by borax injury." His testimony is not contradicted as to the effect of borax as acting as a preservative rather than a cause of decomposition.    His testimoney should be regarded as very significant, as the rights of the parties should be determined from the necessary effect of the evidence. If Soule is right, therefore it practically confutes the fact that rotted seed could be caused by coming in contact with a preservative compound.    The force of this testimony is especially significant as it is conceded by all, experts and potato growers alike, that borax is not the exclusive cause of the failure of a crop of potatoes, but there are many other causes, including the method of mixing the chemicals, proximity of the seed to the normal fertilizer, which causes decay of seed and hence failure of crop, just as the evidence shows the seed in the present case appeared as the hills were dug into,   .   .   weather conditions and other causes.    The contradictory testimony of Soule proved that something beside borax caused the rot.    It, therefore, follows, that if the cause of the rot was the cause of the crop failure, it was some other cause than that of borax.    Soule, however, in the face of his own testimony as to the preservative properties of borax, gives it as his opinion that borax poisoning was the cause of the failure of the potato crop, but we think that his positive testimony, based upon a broad investigation, is controlling over an opinion in direct conflict with his experiment as to the preservative effects of borax and with the testimony of all the witnesses that the seed in the plaintiff's field had decayed.

The preservative effect of borax on the seed is of fundamental importance, as it is a distinctive charactistic of borax poisoning and can no more be rebutted by the appearance of the leaves and other symptoms which are common to every crop of potatoes than can the characteristic symptoms of tuberculosis or heart disease be

rebutted by the presence of toothache or the many other common ills that effect the human system. Like tubercular effect the preservative effect is peculiar to the disease of borax poisoning and when that effect is found the cause is found. Borax preserves; it does not decay. The effect of preservation of seed is traced to borax. The effect of decay of seed is not traced to borax. Hence if decay is general, as in the plaintiff's case, the cause was other than borax. Soule's testimony should be read in connection with the evidence of the experiments that even as high as twelve pounds of borax was beneficial. There is one other symptom of borax poisoning to which Professor Woods testified, manifested, as he stated, by "a bright, golden yellow on the margin" of the foliage. Upon this point the following question and answer further illuminate his meaning: Q. "Given a case where a field showed numerous skips, weakly plants, retarded germination, and a considerable number of yellow edged leaves when the plants are young, do you know of anything except borax that would cause all these things?" A. "Not all these things together." Q. "Would borax cause them all  .  .  . borax poisoning?" A. "In my opinion it would." Q. "You say that you know of nothing that would cause all of these things together. Do you know of anything that would cause all of them, each of them separately?" A. "I don't recall anything that would cause the particular golden yellow margin." Q. "Every other thing you have mentioned you know well founded causes for in potato culture, that have been known for years." A. "You might have similar results from other causes." It therefore follows that the only symptom, among the several named, which exclusively indicates borax poison, is the "bright, golden yellow margin," and that when the plants are young. Witnesses on both sides testified with reference to the appearance of the leaves of the potato plants in question and only one out of the whole number testified to observing a golden yellow, and that in the following language: "I noticed the leaves, after awhile, they turned a golden yellow around the edges." This witness leaves off the adjective "bright" and defines the time as "after awhile." But the testimony shows that this symptom appears in the early stages of the growth. None of the other witnesses describe the appearance of the leaves as a golden yellow around the edges. Three of the witnesses simply noticed a yellowing, which of course is common. Two others state the yellowing was brownish,

while only one says it was golden. In no instance is the peculiar and characteristic "bright, golden yellow." around the edges of the leaves described as appearing in the early stages. Moreover, the testimony of the witnesses who examined these potato plants from time to time and described them as yellowing, or a yellow brown, cannot be regarded as negative testimony as they are describing affirmatively what they actually saw. It should also be noted, in this connection, that the witnesses who testified as to the appearance of these potatoes were not defendant's witnesses alone but the plaintiff's as well. We are of the opinion that the plaintiff has failed to establish, by any reliable evidence, even the presence of the symptom of a bright, golden yellow. The evidence to the contrary is overwhelming.

All the evidence including Professor Woods, admits only what is a matter of common knowledge, that all the appearances, except, "the bright, golden yellow," that were present in the foliage of the plants in question are common and ordinary to potato fields all over the State.

There is a great deal of opinion evidenced in this case attributing failure of this particular crop of potatoes to borax poisoning, but such evidence is entitled to weight only when it is fortified by established facts and is consistent with probability and reason. As before shown, the established facts in this case clearly prove that six and six tenths pounds of borax per ton, or per acre, in a fertilizer, is not deleterious to plants. We are of the opinion that the motion should be sustained.

We now come to the exceptions, only one of which we shall consider at length. In passing, it may not be improper to add that a proper interpretation was given to the meaning and application of R. S., Chap. 36, Sec. 12, which provides that "for the purposes of this chapter, an article shall be deemed to be adulterated . . ." "In case of commercial fertilizer . . . . if it contains any material deleterious to growing plants." Under that clause of the statute is presented the only issue in this case. The court held that "deleterious meant deleterious matter in such a quantity as to be deleterious to growing plants," and instructed the jury that the statute was malum prohibitum and applied regardless of scienter on the part of the defendants. The instruction was correct.

The exception, however, which we desire to discuss, is based upon the exclusion of the following offer of evidence, namely: "Defendant

offers evidence of various other farmers tending to prove that such farmers, using chemicals on farms located in the town of Troy and vicinity, purchased from the defendants in 1919, and coming out of the same mass, and combined by them in the same proportions, and using the same amount of potatoes, applying 1200 pounds per acre to one ton per acre, — these figures being given as the equivalent of mixed goods, that is, a weight of $87\frac{1}{2}$ pounds being equal to 100,— produced crops ranging from 200 bushels per acre to 300 bushels per acre." It will undoubtedly be conceded that the above evidence, if admissible, is very important. The plaintiff, however, denies its admissibility upon the ground that it does not state that all the elements in the cases offered correspond with the elements proven in the case at bar. It is true that certain elements are not specifically alluded to, but in view of the plaintiff's statement of the excellent quality of his land, and of his husbandry in planting his crop of potatoes, we think the question should not be excluded upon that ground. Without quoting the testimony, it will be found that the plaintiff strenuously contends that everything which he did in planting his crop of potatoes, from the mixing of the fertilizer to the final cultivation of his crop, was done in an unusually workmanlike manner, and his witnesses, so far as interrogated in that regard, support his contention. Therefore, it is apparent from his statement of the manner in which he planted and cultivated, that his neighbors could not be presumed to have employed any better husbandry in the cultivation of their crops than he had in the cultivation of his. It accordingly follows that if they planted their crops in any degree in a less workmanlike manner, in proportion to that degree they would have obtained a lighter crop. Accordingly, if the evidence was admitted, wherever the planting and cultivating was inferior to that of the plaintiff, the diminished size of the crop on that account would inure to the advantage instead of the disadvantage of the plaintiff, upon the admission of the testimony. The evidence was not offered to prove that the chemicals would produce a crop, or to prove the value of the chemicals as a fertilizer; but to prove that the presence of borax did not render the mixture unsuitable.

The question at issue was, "Is borax present in a quantity, as found in the chemicals sold by the defendant to the plaintiff, deleterious?" In other words, is from five to six and six tenths pounds of boron to the ton practically destructive to growing plants? The

only way to determine whether any substance has a deleterious effect is to try it. Under this principle the plaintiff was permitted to offer evidence tending to show that borax in some quantities was deleterious. Without objection he introduced expert testimony to show that, from their reading, observation of conditions in the field, and experiments conducted in person or in conjunction with others, their conclusions were that boron in sufficient quantity was deleterious. The only thing in the record to show in what amount it was deleterious was the unsupported statement of Dr. Woods that three pounds was harmful and that twenty pounds would kill. All the knowledge possessed by these experts came from conditions not similar to those confronting the plaintiff. The fertilizer was not the same, that is, in the same ratio, and it was in the form of fertilizer, not raw chemicals; the climatic conditions were not the same; the experiments were not conducted in the same vicinity; and the experiments were not a duplicate of field conditions, except in the Presque Isle experiment, where, when six pounds of boron was present a larger crop was obtained than where none was present. This evidence having been offered and given by the plaintiff, the defendant asked to be allowed to show that the same chemicals, from the same mass, used in the same proportion, and the same locus, the same vicinity, by farmers trying to raise a crop of potatoes and not trying to substantiate a theory, used at the same time, under the same climatic conditions as the plaintiff used his, raised two hundred bushels per acre, a fair crop according to the testimony, to three hundred bushels per acre, a large crop, which the defendants contended tended to show that the chemicals contained nothing deleterious.

It must be borne in mind, all the time, that borax is a plant poison and that the evidence shows that there was the definite quantity of six and six tenths pounds of borax in the Sagadahoc fertilizer, and that the question is, and the sole question, whether six and six tenths pounds destroyed the plaintiff's crop? All the testimony shows that borax is an active plant poison when present in such a quantity as to become effective as a poison. Its effect may not be precisely alike in all cases, but when present in poisonous quantities it must be substantially the same. It is like a drug to the human system; up to a certain quantity it may be beneficial; beyond that, poisonous; and a little more, a deadly poison. We think it a reasonable

deduction, that if six and six tenths pounds of borax was sufficiently injurious to practically kill a potato crop in one case, it must necessarily follow that the same quantity would do some injury in any other similar case. The defendants offered to show the converse of this to be true by proving that in the several cases in which the evidence was offered, six and six tenths pounds did not do any harm whatever, and, consequently, it did not do the harm which the plaintiff claimed. And they undertook to do this by offering evidence of actual results from the use of the same kind of fertilizer that was used by the plaintiff. We think the logical effect of the evidence offered tended to rebut the plaintiff's contention.

The plaintiff in his brief makes this comment: "Counsel for the defendants argue that the land on which the whole seed were used produced better than that on which cut seed were used. Their inference is, that the potash, which they say was too close to the seed, thus more easily drew the sap from the seed. But until it is explained why the Bradley's and the manure produced where the Sagadahoc didn't, it seems to counsel for the plaintiff that the only proper inference from these facts is, that the poison from the borax, and not the method of cutting the seed, was the cause of the trouble." According to that comment the plaintiff used the evidence that Bradley's and the manure produced a large crop in proof that the presence of borax in the Sagadahoc was the cause of the small crop. To meet that claim was the very purpose of the offer of the evidence excluded. The offer was to show that, in several cases, some in the same town, the Sagadahoc did produce an unimpaired crop and in some cases a large crop, as large as that produced on Bradley's, and that it was a fair inference from that evidence that six and six tenths pounds of borax, the common factor in the Sagadahoc, was not the cause of the plaintiff's small crop. In view of the fact that there are numerous causes for a failure of a potato crop, the evidence offered becomes of vital importance in tending to prove that the plaintiff's small crop might be due to other things than the presence of borax as the defendants strenuously contended it was, and presented much evidence in support of their claim.

We think the evidence should have been admitted as having a legitimate and logical tendency to rebut the evidence of the plaintiff that six and six tenths pounds of borax, present in the fertilizer which he used, practically destroyed his crop.

The plaintiff contends, however, that the inadmissibility of this evidence has already been determined in *Fertilizer Works* v. *Logan*, 116 Maine, 33. That was a case in which the plaintiff Company had brought suit upon a note given to it by the defendant for commercial fertilizer. The defense was that the fertilizer was guaranteed to contain certain definite percentages of nitrogen, phosphoric acid and potash, and that it was deficient in all three of these particulars. The barrels in which the potash was sold contained the legend 5-8-7. The printed statement affixed to each barrel was the guaranty for breach of which the defendant claimed the right to recoup. The court in stating the issue, said: "The crucial question is one of fact; it is whether the percentage of one or more of the three ingredients referred to was lower than that guaranteed." It is important to note that percentages are the only issue. In proof of that contention the defendant presented evidence of three classes: First, that his own potato crop in 1914, which had been fertilized with 5-8-7, which he bought, yielded only forty barrels to the acre; next, that some of his neighbors, whose lands were near, or contiguous, to his own, and some of them similarly situated, used substantially like amounts per acre of the same brand of fertilizer, taken from the same barge, and experienced a like unsatisfactory result of a small crop.

With reference to the offer of that evidence, the court observes "All this evidence must be viewed with reference to the single point, namely, the percentages of nitrogen, phosphoric acid and potash, because nothing else was guaranteed and no other guaranty is pleaded or relied upon. There was no guaranty of suitableness nor of results from the use of the fertilizer." It was held that the objection to the first class, the defendants' own experience, was tenable on the ground that the proof is too uncertain, too speculative or conjectual, and enumerates numerous other reasons involving all the elements of husbandry in planting and including climatic conditions. It should be observed, however, that the exclusion was not general but limited to the particular issue on trial, as clearly appears from the following language in the opinion namely: "And it has been held that such evidence is inadmissible when the fertilizer was sold on a guaranteed analysis basis only." The phrase "on a guaranteed analysis basis only" is the crucial test that distinguishes the cases cited from the case at bar. In the next sentence after expressing the limitation in the

above language, Chief Justice SAVAGE, with reference to the exclusion of the testimony and the limitation of the exclusion to a fertilizer sold "on a guaranteed analysis basis only," says, "With this view we agree." Then follows a statement of the ground upon which he agrees, namely, "Had there been a guaranty of suitableness, or of results, the evidence would undoubtedly be admissible to be considered with the other facts." In other words, upon a guaranty that a fertilizer is suitable, the excluded evidence, he declares, would not only be admissible, but, by way of emphasis, "would undoubtedly be admissible."

It seems hardly debatable that this differentiation made by the court clearly distinguishes between the issue upon which the evidence was offered in the case at bar and the issue upon which it was offered in the case cited. In the present case there is no question of percentages, which was the only issue in the case cited. There is no question raised but that the percentages 4-8-6 were as guaranteed. The only issue, therefore, was whether the fertilizer containing the elements 4-8-6, as represented, was further guaranteed to be suitable for the raising of potatoes. In other words, its unsuitableness on account of boron was the only issue in the present case. That such was the issue conclusively appears from the plaintiff's declaration in which he avers, speaking of the chemicals, that the goods "were not suitable for mixture as a fertilizer to be used in fertilizing land for the production of potatoes, but contained borax in sufficient quantity to prevent the germination of seed potatoes and to kill the young potato plants and sprouts."

In support of the rule that the excluded evidence would be undoubtedly admissible upon the issue of suitableness, Chief Justice SAVAGE cites two opinions; one from Maryland and one from South Carolina. The Maryland case excluded the evidence upon the ground that "the appellee selected a specific article which was well known to him and the risk of its affecting the object for which he bought it, he, therefore, took upon himself." The South Carolina case excluded the evidence upon the ground of percentages only. The opinion was concurred in by three of the Justices. A dissent was entered by two of the Justices including the Chief Justice. The dissenting opinion held that the evidence should have been admitted, saying "His Honor, the Presiding Judge, allowed the defendant to introduce testimony as to the condition of the crops upon which the fertilizer

was used for the sole purpose of showing that the guaranteed analysis did not contain all the ingredients therein stated. . . . There is no good reason why such fact could not be proved by circumstantial as well as direct testimony, in the absence of a legal requirement providing the manner in which such fact should be established."  .

We are of the opinion, therefore, that both upon reason and authority the evidence excluded in the case at bar should have been admitted.

*Motion sustained.*
*Exceptions sustained.*